# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO.: 5:04CV207-V

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>        Plaintiff,<br><br>and<br><br>PAULA THOMPSON,<br>        Plaintiff-Intervenor,<br><br>v.<br><br>WELBORNE AUTOMOTIVE, INC. formerly known as NISSAN OF HICKORY, INC.,<br>        Defendant. | Memorandum and Order |

**THIS MATTER** is before the Court on Defendant's Motion For Summary Judgment, as well as all related memoranda and exhibits filed in support or in opposition. (Documents ##32 - 34, 37, 40)

## I. Nature Of Case

This civil action is brought by the Equal Employment Opportunity Commission ("EEOC" or "Commission") on behalf of Plaintiff-Intervenor Paula Thompson ("Thompson"),[1] and involves an allegation of gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e-5(f)(1) and (3) ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.

---

[1] For convenience, the Court may refer to the EEOC and Thompson collectively as a single "Plaintiff."

Plaintiff-Intervenor Paula Thompson is a former employee of Defendant Welborne Automotive, Inc., formerly known as Nissan of Hickory, Inc. ("Welborne"). Thompson was hired by former General Manager, Mike Thomas.[2] (Thomas Dep. at 7.) Thompson was originally hired as a Used Car Sales Manager / Sales Manager at Defendant's Nissan of Hickory automobile dealership. (Thompson Aff. ¶2) According to Thomas, Plaintiff's main job was "to assist [Thomas], sell cars, keep up with the used cars and help [Thomas] in that range and with the sales force . . . ."[3] (Thomas Dep. at 31.) Thompson worked for Welborne for approximately three weeks, or from October 15, 2003 through November 4, 2003. (Compl. ¶7; Compl. In Interv. ¶7; Thomas Dep. at 158-59.)

Mike Thomas testified that the late Robert C. Welborne ("Bob Welborne"),[4] then-owner of the dealership, upon learning that Plaintiff Thompson had been hired as a sales manager, immediately questioned Thomas's decision to hire a female as a sales manager. Thomas describes the following exchange:

- When I was standing outside one day right after, like the day after I had hired Paula, and one of the salesman was there . . . Mr. Welborne come[sic] out and he was like, "Come with me right now, come with me." He drove up. He said "Come with me." And I said – you know, I followed him into the office, and I was going to introduce him. I said, "Have you got a minute?" He said, "No. Come right now." So we get in the office and he says, "Who in the hell is that in that tower?" I said, "That's the

---

[2] Thomas and Plaintiff had already known each other for about a year – they first met at Rock Hill Mazda. (Thomas Dep. at 7.)

[3] There is some disagreement as to Thompson's official job duties and responsibilities. Compare Defendant's EEOC Responses with Chris Welborne's version(s) of Plaintiff's job description. (*See* Pl.'s Exh. 9 / EEOC Bates #121; C. Welborne Dep. at 124-26.)

[4] Bob Welborne is deceased.

2

- new sales manager." "Oh, hell, no, it's not. **I'm not having a damn woman. She can sell but she's not going to be a sales manager.** That's outside the question. That's ridiculous and that's not going to happen here. Do you understand that?" (Thomas Dep. at 12-13.)
- Thomas said, "Well, Mr. Welborne, you hired me to run the store. You told me I could hire who I wanted to and she's a good sales manager, and she's one of the best I could find." And that's, he said, **"That's not going to happen. That is not going to happen. I'm not having a woman as a sales manager. Period. End of discussion."** (Thomas Dep. at 13.)
- Chris Welborne was present for the same conversation. Bob Welborne asked Chris what he thought. Chris responded, "Well, daddy, you know, you hired Mike to run the store." He says, "You know, if she can do her job, I don't see where it matters, woman or not." Bob Welborne then stated again, **"No, hell, no, I just don't like that. I just don't like it."** (Thomas Dep. at 13.)
- The conversation ended in agreement. After asking his son's opinion once again, Bob Welborne shook Thomas' hand and represented that he was willing to give Plaintiff a try. (Thomas Dep. at 14.)

According to Mike Thomas, within two or three days of this confrontation, Bob Welborne in fact advised Thomas that his son, Chris Welborne, would be taking over the dealership, and that Thomas would be working for Chris Welborne from now on. (Thomas Dep. at 15.) Thomas testified that things were never the same between him and Bob Welborne from that point forward. (Id. at 15-16.)

According to Mike Thomas, on October 23, 2003, he received a phone call from Bob Welborne. (Thomas Dep. at 18.) Thomas was on his way to his son's ball game.[5] (Id.) Viewed

---

[5] According to Thomas, he negotiated a certain amount of flexibility when he was hired. He testified that he worked an extra day in advance each week so he could attend his son's ball games on

in the light most favorable to the Plaintiff, Bob Welborne directed Thomas to "get back to the store right now, fire that girl, Paula [Plaintiff], and do the sales manager job like you're supposed to be doing." (Id.) Thomas indicated he would not fire Plaintiff because she had done nothing to warrant it and stated he would not return to work. (Id. at 18-19.) Bob Welborne repeated his demand – "Well, if you don't go back now and fire her and take over the desk, then you won't have a job." (Id. at 19.) Thomas chose not to return to work to fire Plaintiff Thompson and, thus, considered himself terminated. (Id. at 159.)

On November 1, 2003, Tony LaRocca ("LaRocca") and Tony Coletti ("Coletti") were hired. (C. Welborne Dep. at 211 / Exh. 9) Defendant represents that around that time, the store was "very much failing and in need of major improvement, and what [Thompson] was doing just wasn't motivating." Chris Welborne testified that he brought LaRocca and Colletti in as a team to try and improve sales:

> "I brought those two guys in as a team about that time, and [Thompson] was wanting to run the desk. I brought those two guys in to be on the desk because they were great closers, high energy, motivators, and I wanted [Thompson] to go in[sic] finance . . . ."

(C. Welborne Dep. at 33.)

Plaintiff Thompson claims that the same day Tony LaRocca was hired, he approached her and warned her that, although that was not the way LaRocca felt, Thompson "would not be a member of the "good ole boys club" there." (Thompson Aff. ¶ 4) According to Thompson, LaRocca advised that "he considered [them] friends enough to tell [her] that [she] needed to start looking for a job." (Id.) According to Plaintiff, when she told LaRocca she was not quitting, he told her that he

---

Thursday and Friday nights. (Thomas Dep. at 19.)

had already hired another used car manager (*i.e.*, her replacement). (Id. ¶5) LaRocca apparently had already decided that Tony Coletti was going to replace Plaintiff. (LaRocca Dep. at 60.)

The facts surrounding Plaintiff's discharge from employment on November 4, 2003, are in dispute. <u>According to Plaintiff</u>, Thompson was discharged as a result of her gender. (Compl. ¶7; Compl. In Interv. ¶7) <u>According to Defendant Welborne</u>, Thompson was not immediately fired or discharged. Welborne suggests instead that Thompson was first asked by LaRocca to move to another management position in finance. (LaRocca Dep. at 59; C. Welborne Dep. at 109.) LaRocca testified that Thompson refused Defendant's reassignment proposals. (LaRocca Dep. at 59, 61.) According to LaRocca, this exchange took place *before* he was directed by Chris Welborne to fire Thompson.[6] (Id. at 60.) After the conversation between LaRocca and Thompson, Thompson reportedly "got her pocketbook and left." (C. Welborne Dep. at 57.)

Thompson contends she asked whether her termination had anything to do with the "good ole boys" discussion and LaRocca purportedly responded, "You know it does." (Thompson Aff. ¶7) LaRocca denies implying that it was in Plaintiff's best interest to resign. (LaRocca Dep. at 70.)

## II. Procedural History

The EEOC commenced this action on December 30, 2004. Thompson filed a Complaint In Intervention on September 8, 2005. The allegations within the two complaints are nearly identical except that Thompson also alleges that Defendant's conduct is "in violation of the public policy of the state of North Carolina as expressed in the Equal Employment Practices Act ("EEPA")," N. C.

---

[6] LaRocca's statement implies that he was told by Chris Welborne to fire Plaintiff. Chris Welborne does not recall any such discussion. According to Chris Welborne, on November 4, 2003, LaRocca had the authority to fire Thompson but Welborne's understanding was that LaRocca was going to offer Thompson another position. (C. Welborne Dep. at 210-11.)

5

Gen. Stat. §143-422.1, *et seq*. (Compl. In Interv. ¶11)

Plaintiffs seek issuance of a permanent injunction enjoining Defendant from engaging in sex discrimination against women, including making employment decisions affecting women based on their sex, an order requiring Defendant to institute and carry out policies, practices, and programs that provide equal employment opportunities for women, back pay, reinstatement or front pay, compensation for past and future pecuniary losses (including job search expenses), compensation for past and future non-pecuniary losses (including emotional pain, suffering, inconvenience, loss of earning capacity, loss of enjoyment of life, humiliation, loss of self-esteem and loss of civil rights), punitive damages, and an award to the Commissioner for its costs associated with this action. (Compl. ¶¶A-H; Compl. In Interv. ¶¶A-H)

### III. Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.

### IV. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C.

§2000e-2(a)(1).

Under Title VII, a plaintiff may defeat summary judgment and establish a claim of intentional discrimination through one of two avenues of proof. *See* Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005) (racial discrimination) (*citing* Hill v. Lockheed Martin Logistics Mgt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (*en banc*)). "A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as [gender] motivated the employer's adverse employment decision . . . Alternatively, a plaintiff may proceed under [the *McDonnell Douglas*[7]] "pretext" framework, under which the employee, after establishing a prima facie case[8] of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Id. (*quoting* Hill, 354 F.3d at 285.))

"Regardless of the type of evidence offered as support for [a] discrimination claim (direct, circumstantial, or evidence of pretext), or whether [the Plaintiff] proceeds under a mixed motive or single motive theory, [t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill, 354 F.3d at 286 (*quoting* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000)).

---

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

[8] In order to establish a *prima facie* case of disparate treatment based upon sex or gender under Title VII, Plaintiffs must demonstrate: 1) that Thompson is a member of a protected class; 2) that Thompson was qualified for her job and performing satisfactorily; and 3) that Thompson suffered an adverse employment action. Karpel v. Inova Health Sys. Serv., 134 F.3d 1222, 1228 (4th Cir.1998); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

V. Analysis

In this case, Plaintiff Paula Thompson and the EEOC allege that Thompson's gender was a motivating factor in the challenged employment decision. In support, Plaintiff presents both direct and circumstantial evidence of intentional discrimination based upon gender.

"[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. §2000e-2(m). The impermissible factor alleged, namely, Plaintiff's gender, need not have been the sole factor.[9] Diamond, 416 F.3d at 318 (*citing* 42 U.S.C. §2000e-2(m)). As long as Plaintiff can show that her gender motivated the adverse action, she can establish an unlawful employment practice. Id.

On this record, a mixed-motive analysis is proper given the evidence of a discriminatory animus or purpose presented by Plaintiff. *See* Diamond, 416 F.3d at 319 n.4 ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case.") (*internal citations omitted*).

### A. Direct Evidence Of Intentional Discrimination

Plaintiff produces direct evidence of intentional discrimination, namely, the discriminatory statements allegedly made by Bob Welborne. (Thompson Dep. at 195-98.) Paula Thompson, who did not personally observe or hear the purported discriminatory statements, testified that on the day Mike Thomas claims he was fired, he phoned Plaintiff to tell her about the alleged comments.

---

[9] Under a mixed motive analysis, an employer's defense that it would have terminated Plaintiff notwithstanding any alleged discriminatory purpose, if successful, limits Plaintiff's remedies as opposed to barring recovery. 42 U.S.C. §2000e-5(g)(2)(B); Diamond, 416 F.3d at 317.

8

Defendant calls Plaintiff's claim "ridiculous." (Pls.' Exh. 10) In an attempt to rebut Plaintiff's allegations, Defendant Welborne represents that Thompson had three separate encounters with Bob Welborne prior to the date at issue. Defendant argues that if Welborne truly intended to fire Thompson based upon her gender, he would have done so immediately upon learning of her hire. Defendant's argument is undermined by the relatively short time period (a total of three weeks) involved. Moreover, Defendant concedes that Thompson and Bob Welborne were not introduced during the first encounter (*i.e.,* when Thompson was first spotted by Bob Welborne in the sales tower). Rather, formal introductions were made a few days later . (Thompson Dep. at 166.) The third face-to-face encounter occurred on October 23, 2003 – Mike Thomas's last day of employment with Welborne.[10] (Thompson Dep. at 167; Thomas Dep. at 158-59.)

According to Plaintiff, General Manager, Tony LaRocca , also implied that Plaintiff's gender was a factor in Defendant's employment decision by referencing the "good ole boys club." The statements allegedly made by Tony LaRocca, if proven, corroborate Mike Thomas' testimony that Plaintiff's gender was problematic for Bob Welborne or, at minimum, a motivating factor in Welborne's employment decision.

**B. Regardless Of The Avenue Of Proof, Genuine Issues Of Material Fact Preclude Summary Judgment**

Plaintiff alleges the following genuine issues of material fact exist precluding summary judgment on her Title VII claim: 1) the extent to which Bob Welborne was involved in running the store when Thompson was allegedly fired, and the extent to which he participated in or influenced

---

[10] In fact, if a jury found Mike Thomas' version of the facts credible, a reasonable jury could conclude that it was the third engagement with the Plaintiff that triggered Bob Welborne's alleged ultimatum to Mike Thomas.

the employment action at issue; and 2) the degree to which Thompson's gender was a motivating factor for the challenged employment action. The Court agrees with Plaintiff on this score.[11]

### i. Genuine Issue of Material Fact – Bob Welborne's Influence On Challenged Employment Action

Defendant contends that even if the Court accepts that Bob Welborne made the discriminatory statements attributed to him by Mike Thomas, Bob Welborne was no longer running the company. The Court agrees with Defendant that Bob Welborne's alleged discriminatory comments are only relevant if he can be deemed a decision maker for (or agent of) Welborne for purposes of Title VII. *See* Hill, 354 F.3d at 291. However, the record evidence is less than clear on this point.

Plaintiff Thompson propounded an interrogatory that asked for the specific date on which Bob Welborne was "last actively involved" in the management of the company. According to Defendant's interrogatory responses, "Mr. Welborne was **actively involved** in the management of Nissan of Hickory **until it was sold**." (Pl.'s Exh. 1 / Def.'s Resp. to Plaintiff-Intervenor's First Set Of Interrogs., ¶3) (*emphasis added*) The decision to sell the Nissan of Hickory dealership was not made until December 2003 and the actual sale occurred in May of 2004, well after Plaintiff was

---

[11] The same might be true regarding the existence of an adverse employment action, if the jury were to find that Plaintiff walked off the job, resigned, or quit after being advised that she was no longer going to be a Sales Manager. In other words, if Plaintiff were merely reassigned to another comparable position (as opposed to being fired) with the same pay, benefits, or status, Plaintiff may not be able to prove that she was subject to an adverse employment action as that term is defined by relevant case law. *See* Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir.2007) (Under Title VII, adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment, bu the mere fact that a new job assignment is less appealing to the employee does not constitute adverse employment action) (*citing* James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 371 (4th Cir.2004); Boone v. Goldin, 178 F.3d 253, 256-57 (4th Cir.1999)). Defendant recognizes as much but analyzes the case consistent with an adverse employment action having occurred on November 4, 2003. (Def.'s Mem. In Supp. at 4-5.)

discharged. (C. Welborne Dep. at 17.) In the same document, Defendant stated that "Chris Welborne was involved in the management of Nissan of Hickory from mid-October 2003 through December 24, 2003." (Id. ¶4) Bob Welborne also authored the second EEOC response submitted on behalf of Welborne, which was not dated and was (obviously) subsequent to Thompson's departure. (Pl.'s Exh. 9 / EEOC Bates 121) This evidence precludes a determination as a matter of law that Bob Welborne could not reasonably be deemed the principal decision maker with respect to the challenged employment action.

### ii. Genuine Issue Of Material Fact – Reason For Termination

Defendant's explanations for Thompson's proposed reassignment and discharge are all over the map. A review of the evidence reveals that from the earliest stages of this litigation, Welborne's defense has evolved significantly.

According to Defendant's responses to the EEOC, Plaintiff's performance was deficient in at least two respects: 1) sales fell during her tenure; and 2) the staff turnover rate increased during her tenure. (Pls.' Exh. 8, 9) The second response explains that in the month to follow Plaintiff's employment, "wholesale losses were huge in an effort to try to get [Defendant's] used car inventory back into equity position." (Pls.' Exh. 9) The same document states that the staff turnover included six salespeople and one finance manager. (Id.) The third letter written to the EEOC also mentions a problem with Plaintiff's appraisals of trade-ins and adds that Bob Welborne's frustration with Mike Thomas was for hiring management staff without first seeking Welborne's approval - not for hiring a female sales manager. (Pls.' Exh. 10)

Chris Welborne's deposition testimony is inconsistent with the EEOC responses submitted by Defendant. Chris Welborne's deposition testimony seeks to clarify that many of the

11

responsibilities first identified by Defendant as Thompson's purported weaknesses were not within the realm of her duties. (C. Welborne Dep. at 124-26.) For instance, Chris Welborne testified that the decline in sales and staff turnover could not really be attributed to Plaintiff. (Id. at 126-27, 129, 137.) Chris Welborne further testified that he did not want to lose Thompson as an employee but wanted to capitalize on her strengths and experience in finance. (C. Welborne Dep. at 109, 132.) According to Defendant, Welborne would have considered placing Thompson at one of the other stores "had she been willing to work, try to work it out. . . ."[12] (Id. at 211.) Despite his testimony that he was disappointed in Plaintiff's lack of ability to "close the deal," Chris Welborne ultimately testified that Plaintiff was not fired because of poor performance. (C. Welborne Dep. at 55, 77, 115.)

After backing off of its initial claim that Plaintiff was responsible for the dealership's decline in sales and staff turnover, Welborne now explains that its decision to reassign Thompson was based upon Thompson's alleged failure to obtain a customer's signature on a sales / purchase contract – a costly mistake per Welborne. (LaRocca Dep. at 55-57, 113.) In her affidavit, Thompson states that, "[t]o the best of [her] knowledge, [she] did not fail to get a customer's signature on a sales contract." (Thompson Aff. ¶8) Thompson avers that, as Sales Manager, her responsibilities "did not include getting signatures on sales contracts." (Thompson Aff. ¶8) Rather, "[t]hat was done in the Finance office," consistent with her past experience and industry practice. (Thompson Aff. ¶¶8, 10) Thompson states she did not fill in for the finance manager, nor was she ever asked to take on this role, during the period of time (two or three days) that she worked with Tony LaRocca. (Id.) Thompson states that "Neither LaRocca nor anyone else in or out of management ever told me that

---

[12] As mentioned, *supra*, Defendant contends that two other management positions were offered to Thompson but she declined – finance manager position(s) at both the Suzuki and Nissan locations. (LaRocca Dep. at 59-61.)

I had allegedly failed to obtain a customer signature on a sales contract. The first time I heard that was in this lawsuit." (Id.) LaRocca testified that he, in fact, told Plaintiff about the alleged mistake and explained Chris Welborne's subsequent anger. (LaRocca Dep. at 70.) LaRocca denies being advised or aware of any other reason for Plaintiff's termination. (Id.)

Welborne has not produced (in discovery or to this Court in support of its motion for summary judgment) a copy of the sales contract with a missing signature that Welborne asserts precipitated its decision to reassign Thompson from sales to finance. Similarly, Defendant produces no (zero) concrete evidence in support of its original position that Plaintiff's performance was unsatisfactory in any way, or that the used car department suffered in any respect as a result of Thompson's brief tenure with Welborne.[13] Finally, Chris Welborne admitted during his deposition that, upon learning of Plaintiff's EEOC complaint, Welborne made no effort to preserve records potentially relating to the instant claims. (C. Welborne Dep. at 158.)

Defendant's responses to the EEOC complaint, like the deposition testimony of its management personnel, are wrought with inconsistencies.[14] (*Compare* Pls.' Exhs. 8 - 10) There is indeed a question of fact with respect to who authored at least one of the responses. Chris Welborne contends that another manager from another dealership actually drafted the EEOC response that he signed. However, that individual, namely, Herb Gay, apparently denies writing the letter on Chris Welborne's behalf. (C. Welborne Dep. at 114-15, 206-07.) Likewise, questions of

---

[13] Defendant refers to its sales records, etc., in the months following Plaintiff's employment as evincing support for its position but fails to produce any such records. In light of Chris Welborne's deposition testimony, these records are less probative of the ultimate issue of intentional discrimination than originally represented by Defendant.

[14] A reasonable juror could find that Defendant's responses contain post-hoc pretextual bases for Plaintiff's discharge.

13

fact relevant to Defendant's employment decisions (*e.g.*, plaintiff's job performance, plaintiff's failure to obtain a signature on a sales contract, etc.) must be resolved.[15] Summary judgment is not appropriate.

### C. Punitive Damages

With respect to Plaintiffs' claim for an award of punitive damages, the Court will likewise deny summary judgment.

## VI. Conclusion / Order

Plaintiff's evidence presents genuine issues of material fact. Based upon the direct evidence of intentional discrimination produced by Plaintiff, a reasonable jury could find that Defendant harbored a discriminatory animus towards its female employees as alleged in Plaintiff's Complaint. Moreover, Plaintiff presents sufficient circumstantial evidence from which an inference of gender-based discrimination could be reasonably drawn. For the reasons stated herein, Plaintiff's evidence

---

[15] The confusion surrounding Plaintiff's actual job duties, combined with her abbreviated employment period, complicates any meaningful evaluation of her performance. Tony LaRocca testified that because he did not work with Plaintiff long, he didn't really have enough time to evaluate Plaintiff's experience or performance. (LaRocca Dep. at 62.) However, LaRocca described Plaintiff as "always very pleasant." (Id. at 68.) According to LaRocca, "everybody liked her" and "[n]o one wanted to get rid of her." (Id. at 77.) LaRocca explained that in terms of Plaintiff's ability to close deals, her style was simply a "little different" than his own style (*i.e.*, not as vocal). (Id. at 64-65.)

According to Mike Thomas, Thompson's performance was satisfactory. (Thomas Dep. at 19-20.) Thomas testified that Bob Welbone inquired a few times about Plaintiff's performance and that Thomas always responded positively. (Id.) Thomas contends that Chris Welborne was present during one such occasion and that Chris agreed that there was no problem with Plaintiff's actual performance. (Id. at 20.) Thomas specifically recalls telling Bob and Chris Welborne that Plaintiff was "doing a good job." (Id.) Thomas elaborated, "Because the guys did what she said, move the lot. We didn't have anybody, you know, not doing what she had told them to. We didn't have any complaints from the sales people. I mean they fell right in and did exactly what she said to do." (Id.) Thomas denied ever receiving any complaints about Plaintiff Thompson regarding her ability to assess trade-ins, work deals, or supervise the sales force when he wasn't there. (Thomas Dep. at 30.) Thomas testified that Plaintiff did "whatever needed to be done" and "could do all around, anything at the store." (Id.) Thomas denied ever receiving any complaints from Bob or Chris Welborne about Plaintiff's job performance. (Id. at 31.)

is sufficient to overcome Defendant's motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion For Summary Judgment is hereby **DENIED**. Accordingly, this matter will be placed on the **January 2008 trial term** in the Statesville Division, with calendar call on Monday, January 7, 2008, and jury selection to commence on Tuesday, January 2008.

Signed: November 26, 2007

Richard L. Voorhees
United States District Judge